# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHWEST OHIO REGION, | : | APPEAL NO.  C-250163 |
| | | TRIAL NO.    A-2100870 |
| SHARON LINER, M.D., | : | |
| | : | |
| PLANNED PARENTHOOD OF GREATER OHIO, | : | *JUDGMENT ENTRY* |
| | : | |
| PRETERM-CLEVELAND, | : | |
| | | |
| WOMEN'S MED GROUP PROFESSIONAL CORPORATION, | : | |
| | : | |
|    and | : | |
| | | |
| NORTHEAST OHIO WOMEN'S CENTER LLC, | : | |
| | : | |
|     Plaintiffs-Appellees, | : | |
| | | |
|   vs. | : | |
| | | |
| OHIO DEPARTMENT OF HEALTH, | : | |
| | | |
| BRUCE VANDERHOFF, | : | |
| | | |
|    and | : | |
| | | |
| STATE MEDICAL BOARD OF OHIO, | : | |
| | | |
|     Defendants-Appellants, | : | |
| | | |
|    and | : | |
| | | |
| MELISSA POWERS, | : | |
| | | |
| EMILY SMART WOERNER, | : | |
| | | |
| G. GARY TYACK, | : | |
| | | |
| ZACH KLEIN, | : | |

# OHIO FIRST DISTRICT COURT OF APPEALS

MICHAEL C. O'MALLEY

MARK GRIFFIN,

MARLENE RIDENOUR,

MATHIAS HECK, JR.,

THEODORE A. HAMER,

ELLIOT KOLKOVICH,

   and

JANET CIOTOLA,

    Defendants.

:

:

:

:

:

:

:

:

:

:

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed as modified.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 2/25/2026 per order of the court.**

**By:**_____
       **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| PLANNED PARENTHOOD SOUTHWEST OHIO REGION, | : | APPEAL NO. | C-250163 |
|  |  | TRIAL NO. | A-2100870 |
| SHARON LINER, M.D., | : |  |  |
|  | : |  |  |
| PLANNED PARENTHOOD OF GREATER OHIO, | : | *O P I N I O N* |  |
|  | : |  |  |
| PRETERM-CLEVELAND, | : |  |  |
| WOMEN'S MED GROUP PROFESSIONAL CORPORATION, | : |  |  |
|  | : |  |  |
| and | : |  |  |
| NORTHEAST OHIO WOMEN'S CENTER LLC, | : |  |  |
| Plaintiffs-Appellees, | : |  |  |
| vs. | : |  |  |
| OHIO DEPARTMENT OF HEALTH, | : |  |  |
| BRUCE VANDERHOFF, | : |  |  |
| and | : |  |  |
| STATE MEDICAL BOARD OF OHIO, | : |  |  |
| Defendants-Appellants, | : |  |  |
| and | : |  |  |
| MELISSA POWERS, | : |  |  |
| EMILY SMART WOERNER, | : |  |  |
| G. GARY TYACK, | : |  |  |
| ZACH KLEIN, | : |  |  |

# OHIO FIRST DISTRICT COURT OF APPEALS

MICHAEL C. O'MALLEY                    :

MARK GRIFFIN,                          :

MARLENE RIDENOUR,                      :

MATHIAS HECK, JR.,                     :

THEODORE A. HAMER,                     :

ELLIOT KOLKOVICH,                      :

   and                    :

JANET CIOTOLA,                         :

   Defendants.            :


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed as Modified

Date of Judgment Entry on Appeal: February 25, 2026


*Camila Vega*, *Hannah Swanson*, *The Cochran Firm* and *Fanon A. Rucker*, for Plaintiffs-Appellees Planned Parenthood Southwest Ohio Region, Planned Parenthood of Greater Ohio, and Sharon Liner, M.D.,

*American Civil Liberties Union of Ohio Foundation, Inc.*, *B. Jessie Hill*, *Freda J. Levenson* and *Rebecca Kendis*, and *American Civil Liberties Union Foundation*, *Jennifer Dalven*, *Chelsea Tejada* and *Rachel Reeves*, for Plaintiffs-Appellees Preterm-Cleveland, Women's Med Group Professional Corporation, and Northeast Ohio Women's Center, LLC,

*Dave Yost*, Ohio Attorney General, and *Amanda L. Narog*, Assistant Ohio Attorney General, for Defendants-Appellants.

**KINSLEY, Presiding Judge.**

**{¶1}** Defendants-appellants the Ohio Department of Health, health department director Bruce Vanderhoff, and the State Medical Board of Ohio (collectively the "State") appeal the trial court's judgment declaring 2020 Am.S.B. No. 27 ("S.B. 27") to be unconstitutional under Article I, Section 22 of the Ohio Constitution ("the Reproductive Freedom Amendment"). S.B. 27 mandates that fetal tissue from procedural abortions be disposed of by interment or cremation. The bill also imposes certain financial, record-keeping, and notification requirements as to the disposition of fetal tissue on abortion facilities and amends the definition of the term "probable gestational age." Ruling on a motion for a judgment on the pleadings filed by plaintiffs-appellees Planned Parenthood Southwest Ohio Region, Dr. Sharon Liner, Planned Parenthood of Greater Ohio, Preterm-Cleveland, Women's Med Group Professional Corporation, and Northeast Ohio Women's Center LLC (collectively "the providers"[1]), the trial court concluded that S.B. 27's dispositional mandate discriminates against the right to reproductive freedom by requiring differential treatment for fetal tissue that results from a procedural abortion. It then determined that the remainder of S.B. 27 could not be severed from this unconstitutional provision and enjoined enforcement of the entire bill.

**{¶2}** The State raises two narrow assignments of error on appeal. First, it contends that the Reproductive Freedom Amendment does not apply to conduct that occurs after a completed abortion—in other words, the disposition of fetal tissue by an abortion facility after the procedure has concluded. As we explain in this opinion, we reject this proposition. The Amendment's plain text prohibits *any* State action that

---

[1] We use the term "providers" because plaintiffs-appellees describe themselves in their complaint as "providers of procedural abortions in Ohio."

burdens, penalizes, or discriminates against the right to an abortion, regardless of what stage of the abortion process the State action covers. *See* Ohio Const., art. I, § 22(B) ("The State shall not, directly or indirectly, burden, penalize . . . or discriminate against . . . [a]n individual's voluntary exercise of th[e] right [to an abortion]."). We accordingly decline the State's invitation to read into the Reproductive Freedom Amendment a temporal limitation that does not exist. And because the State did not assign any other aspect of the trial court's holding that the dispositional requirement of S.B. 27 is unconstitutional, we limit our review of that determination to this narrow issue.

{¶3} Second, the State alleges that, having found the fetal tissue dispositional requirement unconstitutional, the trial court erred in refusing to sever that portion of the law from the remainder of S.B. 27. It argues that parts of the bill—like the change in the definition of "probable gestational age" and the introduction of new record-keeping requirements—are enforceable outside of the interment and cremation provisions. We agree with the State, at least in part. A portion of S.B. 27 amends existing abortion regulations that are wholly unrelated to the disposition of fetal tissue. Because these provisions are capable of independent meaning, they are separately enforceable and must be severed. But the lion's share of S.B. 27 imposes obligations on abortion providers that flow directly from the fetal tissue provision, and we concur with the trial court's assessment that these sections cannot be severed. We therefore uphold the majority of the trial court's injunction, making only slight modifications to its judgment to excise the severable portions of S.B. 27.

### Background

{¶4} We begin with a summary of S.B. 27 itself. Adopted by the General Assembly in 2020, the bill amended three existing statutes—R.C. 2317.56, 3701.341,

6

and 3701.79—and enacted a number of new ones. Its stated purpose was "to impose requirements on the final disposition of fetal remains from surgical abortions."

{¶5} In that regard, S.B. 27 enacted a new statute, R.C. 3726.02(A), which provides that "[f]inal disposition of fetal remains from a surgical abortion at an abortion facility shall be by cremation or interment." We refer to this mandate as the "dispositional requirement." Also among the statutes created by S.B. 27 was R.C. 3726.01, which defines "cremation," "interment," "abortion facility," and other key terms pertaining to R.C. 3726.02(A)'s dispositional requirement. S.B. 27 then enacted a comprehensive scheme of new regulations governing the disposition of fetal tissue. These provisions include:

(1) R.C. 3726.03, which creates the right of a pregnant person who seeks an abortion to select between cremation and interment as the method of disposition for fetal tissue;

(2) R.C. 3726.04, which specifies the manner in which a pregnant person may register the selection between dispositional methods (in writing), how disposition is selected when a minor obtains a surgical abortion, and the ability of an abortion facility to select the dispositional method where a pregnant person does not;

(3) R.C. 3726.05, which prohibits the release of fetal tissue by abortion facilities prior to the selection of a dispositional method;

(4) R.C. 3726.09, which requires that abortion facilities fund the disposition of fetal tissue, subject to one narrow exception;

(5) R.C. 3726.10 and 3726.11, which mandate that abortion facilities document the manner and date of disposition;

(6) R.C. 3726.12 and 3726.13, which require that abortion facilities maintain

certain policies and lists related to the disposition of fetal tissue;

(7) R.C. 3726.14, which directs the health director to adopt rules governing the manner in which an abortion facility notifies a pregnant person of the right to select a manner of disposition and records the person's selection within 90 days of the bill's effective date;

(8) R.C. 3726.15 and 3726.95, which exempt pregnant persons from liability for noncompliance with S.B. 27 provided the person complies with certain requirements;

(9) R.C. 3726.16, which indicates that conflicting provisions of the Revised Code do not apply to the disposition of fetal tissue;

(10) R.C. 3726.99, which imposes criminal liability on abortion facilities for violating the requirements of S.B. 27;

(11) R.C. 4717.271, which prohibits certain activities by crematory facilities with regard to fetal tissue from surgical abortions; and

(12) R.C. 2317.56(B)(4), which prohibits surgical abortions in the absence of notification to the pregnant person of the right to select a method of disposition and receipt of the person's selection in writing, except in cases of medical necessity or medical emergency.

{¶6} Read together, these provisions give meaning to S.B. 27's dispositional requirement. In relevant part, S.B. 27 requires abortion providers to provide a notification form to patients listing the two dispositional options, and the providers must document their patient's selection on a consent form. If the patient is a minor, S.B. 27 requires parental consent to the disposition determination or a judicial bypass order. Abortion providers must facilitate and pay for the cremation or interment of fetal tissue, maintain a list of facilities willing to dispose of the tissue by burial or

cremation, and store the tissue until disposition. Abortion facilities and physicians who do not comply with S.B. 27's requirements face criminal penalties, financial penalties and fines, civil damages, and disciplinary action, including license revocation.

{¶7} In addition to enacting this new statutory regime, S.B. 27 also amended existing abortion regulations in the Revised Code. Notably, it updated the definition of the term "probable gestational age" in R.C. 2317.56(A)(3) to include the words "zygote" and "blastocyte."[2] This was significant because R.C. 2317.56(B) specifies when an abortion may be lawfully performed, and the assessment of "probable gestational age" is a component of this regulation. S.B. 27 also amended R.C. 3701.79(C), which requires a physician to create an individual abortion report for each procedure, to include abortions involving these organisms. The bill similarly amended R.C. 3701.79(I) to require health department data on abortions to be reported inclusive of "zygote[s]" and "blastocyte[s]." None of these provisions explicitly cross-reference or otherwise relate to the dispositional requirement.

{¶8} S.B. 27 took effect on April 6, 2021 and was promptly challenged by the providers in court.[3] Their original complaint sought to enjoin S.B. 27 in its entirety, both preliminarily and permanently. The providers also sought a declaration that the bill violated the Ohio Constitution.

{¶9} In April 2021, and again in January 2022, the trial court preliminarily enjoined the enforcement of S.B. 27. But then, in June 2022, the United States Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, 597 U.S.

---

[2] The term "probable gestational age" had previously been defined only by reference to the terms "embryo" and "fetus." S.B. 27 therefore expanded the "probable gestational age" definition to include a wider range of biological organisms in its coverage.
[3] In fact, the providers preemptively filed this action in March 2021, before the bill became law.

215, 293, 300 (2022), in which it reversed *Roe v. Wade*, 410 U.S. 113 (1973), and overturned the federal constitutional protection for abortion. In its place, *Dobbs* returned the question of reproductive freedom to the states, allowing each state to determine for itself whether to prohibit, regulate, or protect access to abortion. *Dobbs* at 302.

{¶10} In response, on November 7, 2023, the Ohio voters approved the Reproductive Freedom Amendment, which enshrines protection for abortion and other reproductive decisions into the Ohio Constitution. The Amendment contains four subsections—(A), (B), (C), and (D). The first two subsections—(A) and (B)—are particularly relevant to this appeal. They read:

(A) Every individual has a right to make and carry out one's own reproductive decisions, including but not limited to decisions on:

1. contraception;

2. fertility treatment;

3. continuing one's own pregnancy;

4. miscarriage care; and

5. abortion.

(B) The State shall not, directly or indirectly, burden, penalize, prohibit, interfere with, or discriminate against either:

1. An individual's voluntary exercise of this right or

2. A person or entity that assists an individual exercising this right,

unless the State demonstrates that it is using the least restrictive means to advance the individual's health in accordance with widely accepted and evidence-based standards of care.

10

Ohio Const., art. I, § 22.

**{¶11}** As written, subsection (A) of the Reproductive Freedom Amendment sets forth the affirmative right to an abortion for all individuals. We refer to this subsection as the "abortion guarantee." In contrast, subsection (B) of the Amendment constrains governmental regulation of the right to an abortion, as well as actions by the State that single out abortion providers for negative or disparate treatment. We refer to this subsection as the "State action restriction."

**{¶12}** Following the enactment of the Reproductive Freedom Amendment, the providers amended their complaint to challenge S.B. 27 under this new provision. They again challenged S.B. 27 in its entirety, asserting five causes of action: (1) the right to reproductive freedom under the Reproductive Freedom Amendment, (2) substantive due process under Article I, Sections 1, 16, and 20 of the Ohio Constitution, (3) equal protection under Article I, Section 2 of the Ohio Constitution, (4) vagueness, and (5) declaratory judgment. They sought a judgment that S.B. 27 violates the Ohio Constitution and a permanent injunction against its enforcement, among other forms of relief. The State answered the amended complaint, denying the providers' claims.

**{¶13}** Shortly thereafter, the providers filed a Civ.R. 12(C) motion for a judgment on the pleadings. The motion was not specific as to which claim(s) formed the basis of the providers' request. But in substance it argued that S.B. 27's dispositional requirement violated the Reproductive Freedom Amendment by discriminating against the right to an abortion. In this regard, the providers contended that the disposition of fetal tissue from procedural abortions is subject to heightened regulations not otherwise applicable to the disposition of fetal remains. To make this point, the providers argued that, prior to S.B. 27, Ohio law treated embryonic and fetal tissue resulting from procedural abortions the same way it treated

the tissue retrieved from any other medical procedure—the tissue could be disposed by incineration, autoclaving, or chemical treatment. After S.B. 27, however, only the embryonic and fetal tissue from an abortion must be cremated or interred.

{¶14} This argument was directed to the providers' claims for declaratory judgment and under the Reproductive Freedom Amendment and did not directly advance the substantive due process, equal protection, and vagueness claims raised in the providers' amended complaint. Nonetheless, the providers sought to obtain a complete judgment in their favor without reference to any specific cause(s) of action.

{¶15} The State opposed the providers' motion for a judgment on the pleadings. It raised three primary arguments. First, it contended that S.B. 27's dispositional requirement solely regulates conduct occurring after an abortion and therefore cannot be interpreted to restrict or burden an individual's right to an abortion under the Reproductive Freedom Amendment. Next, it argued that, even if S.B. 27 affects an individual's right to an abortion, the providers lacked standing to assert that right on behalf of their patients. Lastly, the State argued that the trial court should sever the dispositional requirement from the remainder of S.B. 27 should it find that provision to be unconstitutional. The providers did not reply to the State's opposition.

{¶16} One month later, the trial court granted the providers' motion for a judgment on the pleadings. In so doing, it first rejected the State's standing argument, finding that the Reproductive Freedom Amendment separately protects those, like the providers, who assist another person in exercising the right to an abortion. Because S.B. 27 imposes independent requirements on abortion providers, the trial court concluded that the providers in this case were sufficiently burdened by the bill to challenge its terms.

{¶17} In addressing the constitutionality of the dispositional requirement, the trial court reasoned that S.B. 27 discriminates against abortion providers because its mandates only apply to fetal tissue from procedural abortions and not other forms of fetal remains. Going a step further, it rejected the State's argument that S.B. 27 only applies to events after an abortion, observing that S.B. 27 regulates a significant amount of preprocedure conduct—abortion providers must explain cremation and interment decisions to patients, must establish relationships with crematories and funeral homes, and must provide funds for cremation or burial, all before an abortion takes place.

{¶18} Having determined that S.B. 27 violated the substantive guarantees of the Reproductive Freedom Amendment, the trial court applied the scrutiny mandated by Article I, Section 22(B) of the Ohio Constitution. That provision permits the State to discriminate against the right to an abortion if it "demonstrates that it is using the least restrictive means to advance the individual's health in accordance with widely accepted and evidence-based standards of care." In the trial court's view, the State had not met—nor had it even attempted to meet—this burden; in fact, the State had not even proffered any argument suggesting that S.B. 27 "advances [an] individual's health," nor had it described the applicable standards of care that would apply or how its regulations were the least restrictive means of meeting those objectives.

{¶19} As to severability, the trial court determined that all of the newly-enacted and amended statutory provisions contained in S.B. 27 contemplated or cross-referenced the dispositional requirement. As a result, the trial court reasoned that the unconstitutional portion of S.B. 27 could not be severed from the remainder of the bill. The trial court accordingly issued a permanent injunction barring the State from enforcing S.B. 27 in its entirety.

**{¶20}** The State appeals.

## *Analysis*

**{¶21}** In two assignments of error, the State challenges the trial court's decision granting a judgment on the pleadings to the providers. It does so on limited grounds. In its first assignment of error, the State attacks the trial court's judgment declaring the dispositional requirement unconstitutional based on its construction of the Reproductive Freedom Amendment: "The trial court erred in declaring R.C. 3726.02 facially unconstitutional under Article I, Section 22 of the Ohio Constitution because the Amendment does not apply to laws that regulate conduct that occurs after a completed abortion." And in its second assignment of error, the State challenges the trial court's severance analysis: "The trial court erred in finding every other statute in the bill is not severable from R.C. 3726.02, even though one provision creates an independent right for women having an abortion, the other provisions can stand alone, and some have existed for years before being amended in the bill."

**{¶22}** Neither of these assignments of error concerns the question of whether S.B. 27, and the dispositional requirement in particular, discriminate against abortion providers by treating them less favorably than other health care professionals. Nor do they address the question of whether S.B. 27 satisfies the "least restrictive means" standard set forth in Article I, Section 22 of the Ohio Constitution—a question the trial court resolved in the providers' favor. Nonetheless, the State's brief argues in passing that S.B. 27 is not discriminatory and that the providers should be held to a proof-beyond-a-reasonable-doubt standard rather than the "least restrictive means" test applicable to the State under the Ohio Constitution.

**{¶23}** We do not consider these arguments, as the State did not properly present them. To preserve an issue for appellate review, a party must identify the issue

14

in an assignment of error. *See* App.R. 16(A)(3) (requiring an appellant's brief to include "[a] statement of the assignments of error presented for review"). "Assignments of error are vitally important because appellate courts determine each appeal on its merits on the assignments of error set forth in the briefs under App.R. 16." (Cleaned up.) *JPMorgan Chase Bank, N.A. v. Cloyes*, 2021-Ohio-3316, ¶ 10 (10th Dist.); App.R. 12(A)(1)(b) (indicating that the appellate court "[d]etermine[s] the appeal on its merits on the assignments of error set forth in the briefs"). As directed by App.R. 12(A)(1)(b), we review and resolve assignments of error, not mere arguments. Had the State wished for us to review the question of discrimination and the standard and burden applicable to Reproductive Freedom Amendment claims, it should have raised these questions in assignments of error. Having failed to do so, the State waived these issues for our review. *See, e.g., First State Bank v. K & B Indus. Supply*, 2020-Ohio-3376 ¶ 11 (4th Dist.).

### A. *The Reproductive Freedom Amendment*

{¶24} Turning to the State's first assignment of error, it argues that the trial court erred in declaring the dispositional requirement in S.B. 27 unconstitutional because the Reproductive Freedom Amendment does not apply to laws that regulate conduct after a completed abortion. In other words, it contends that judgment on the pleadings was improper under Civ.R. 12(C) because the Ohio Constitution did not entitle the providers to relief.

{¶25} Civ.R. 12(C) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." A motion for a judgment on the pleadings under Civ.R. 12(C) is proper where "the pleadings present[] only questions of law and may only be granted when no material issues of fact exist and the moving party is entitled to judgment as a matter of law."

(Internal quotations omitted.) *Wilhelms v. ProMedica Health Sys.*, 2023-Ohio-143, ¶ 12 (6th Dist.). The pleadings and any reasonable inferences drawn from those pleadings must be liberally construed in favor of the nonmoving party. *Id.* We review a trial court's ruling on a Civ.R. 12(C) motion for a judgment on the pleadings de novo. *Id.*

**{¶26}** The State identifies no material dispute of fact that would preclude judgment on the pleadings under Civ.R. 12(C). Rather, its assignment of error focuses on a question of law—the timeframe and duration of constitutional protection for abortion under the Reproductive Freedom Amendment. In that vein, the State asks us to restrict the application of Article I, Section 22 of the Ohio Constitution to conduct occurring before an abortion.

**{¶27}** To reach this conclusion, the State reads subsection (A) of the Reproductive Freedom Amendment—the abortion guarantee—to limit the prohibitions on State action contained in subsection (B)—the State action restriction. It describes the right to "make and carry out one's own reproductive decisions" as the Amendment's primary protection and argues that any limitation on the State's conduct imposed by the State action restriction necessarily ends once a reproductive decision is effectuated. According to the State, because the abortion guarantee concludes once a reproductive decision has been "carr[ied] out," the State action restriction does then too.

**{¶28}** Whether the State correctly interprets the scope of the State action restriction is a question of first impression, as no appellate court to date has construed the language of the Reproductive Freedom Amendment at all. But we do not view it as a difficult question to resolve, as ordinary principles of statutory construction point clearly away from the State's preferred interpretation.

**{¶29}** When constitutional text is ratified by the voters by direct vote, as the Reproductive Freedom Amendment was, we consider how the text would have been understood by the voters who adopted the amendment. *State v. Yerkey*, 2022-Ohio-4298, ¶ 9. We do so to give effect to the intent of the people. *Id.*, citing *State ex rel. Sylvania Home Tel. Co. v. Richards*, 94 Ohio St. 287, 294 (1916). The starting point of this inquiry is the plain language of the text, considering how the words and phrases would be understood by the voters in their normal and ordinary usage. *Id.*, citing *State v. Jackson*, 2004-Ohio-3206, ¶ 14, and *District of Columbia v. Heller*, 554 U.S. 570, 576-577 (2008).

**{¶30}** In interpreting the plain meaning of the Ohio Constitution, courts typically apply the same rules that govern the construction of statutes. *City of Centerville v. Knab*, 2020-Ohio-5219, ¶ 22. Under these principles, words in the Constitution are afforded their everyday meaning, which is often ascertained by reference to the dictionary. *Id.* at ¶ 24. Though the words themselves are paramount, discussion of the constitutional provision's history and the circumstances of its adoption may provide additional context. *See Yerkey* at ¶ 35 (DeWine, J., dissenting), citing *Knab* at ¶ 22.

**{¶31}** Considering these standards, we conclude that the plain language of the Reproductive Freedom Amendment constrains the State's ability to regulate all phases of an abortion, including conduct occurring after the procedure. We accordingly reject the State's argument that the Amendment does not apply to laws that regulate post-abortion conduct. We reach this conclusion based on four critical observations about the Amendment, its wording, and the context of its passage.

**{¶32} <u>Silence.</u>** First, the State action restriction contains no express indication of when its protections start and stop and no direct timeline for its

application. This silence is significant. Given the lack of any explicit instruction that post-abortion conduct is excluded, we doubt the ordinary voter would have read such a limitation into the provision.

**{¶33}** **Wording.** Second, even though it is silent as to timeline, the language of the State action restriction plainly applies to the regulation of post-abortion conduct. On the one hand, the abortion guarantee appears to cover only the period of time during which reproductive decisions are being determined and effectuated. This is what the terms "make" and "carry out" plainly mean. *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/make (accessed Jan. 16, 2026) [https://perma.cc/PJ9T-PNUE] (defining "make" as "to bring into being by forming, shaping, or altering material"); *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/carryout (accessed Jan. 16, 2026) [https://perma.cc/B592-27AF] (defining "carry out" as "to continue to an end or stopping point").

**{¶34}** But the State action restriction is not so confined. To the contrary, the clear language of that provision prohibits government action that, "directly or indirectly, burden[s], penalize[s], prohibit[s], interfere[s] with, or discriminate[s] against" either the exercise of the right to an abortion or any person or entity who assists with its exercise. Ohio Const., art. I, § 22(B). As contrasted with the "make" and "carry out" language in the abortion guarantee, this wording squarely contemplates regulation of post-abortion conduct.

**{¶35}** For one thing, the State action restriction bars the State from "penaliz[ing]" those who assist in exercising the right to abortion. By definition, conduct cannot be penalized until after it has occurred. *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/penalty (accessed Jan. 16, 2026) [https://perma.cc/P6YP-KW9M] (defining "penalty" as "a disadvantage, loss, or

18

hardship due to some action"). So too does the ban on "discriminat[ion]" apply to conduct occurring after a completed abortion. In its ordinary usage, the word "discriminate" means "to unfairly treat a person or group differently from other people or groups on a class or categorical basis (as race, religion, gender, or sexual orientation)." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/discriminate (accessed Jan. 16, 2026) [https://perma.cc/5VES-UHSU]. Because the State may be unaware of the status of a person's decision-making process, categorization based on the right to an abortion will often occur on the basis that a procedure has been carried out—in other words, *after* the abortion.

{¶36} But perhaps the most obvious indication of the State action restriction's meaning is in its use of the term "burden." Under Article I, Section 22(B), the State may not "directly or indirectly" burden the right to an abortion, either against the individual seeking that form of reproductive care or against an abortion provider. As a noun, the word "burden" means "something oppressive or worrisome." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/burden (accessed Jan. 16, 2026) [https://perma.cc/Y3XC-P9RP]. As a verb, it means to "load" or "oppress." *Id.* Thus, read literally, this provision broadly constrains State authority, as it prohibits the State from acting oppressively in the context of abortion. There is no time limitation in the plain meaning of this word.

{¶37} To illustrate the point, consider the following. Assume the State adopts a law requiring all individuals who undergo an abortion to pay a $50 million tax 30 days after the procedure. Failure to pay is a first-degree felony punishable by life in prison. Although farfetched, the law plainly burdens the right to an abortion. But under the State's construction, the law would not violate the Reproductive Freedom

Amendment because it regulates conduct occurring *after* an abortion. We see nothing in the text, meaning, or understanding of the Amendment that would support such an absurd result. *See* R.C. 1.47(C) (requiring courts to presume "just and reasonable result[s]" in interpreting laws, not absurd ones).

**{¶38}** **Structure.** Third, the structure of a law, or how its terms are used in context, can also support its plain meaning. *See, e.g., Gabbard v. Madison Local School Dist. Bd. of Ed.*, 2021-Ohio-2067, ¶ 17. Reading the words "burden," "penalize," and "discriminate" in the context of the entire State action restriction makes their application to conduct occurring before, during, *and* after an abortion all the more clear.

**{¶39}** As we have noted, the State action restriction significantly constrains the State's ability to regulate in the field of abortion. But it is not absolute. By the clear terms of Article I, Section 22(B), the State retains the authority to enact abortion-related statutes so long as it can demonstrate that doing so is "the least restrictive means to advance the individual's health in accordance with widely accepted and evidence-based standards of care." The State may also ban abortion entirely once a fetus is viable, so long as there are exceptions for physician-documented threats to a pregnant person's life or health. Ohio Const., art. I, § 22(B).

**{¶40}** These two exceptions carve out significant space for the State to operate. And the voters approved the Amendment with the specific understanding that the State had some leeway to regulate and even ban abortion going forward. This makes the Amendment's silence as to a temporal limitation all the more striking. If the Amendment was intended to explicitly carve out a role for the State in regulating post-abortion conduct, one would expect that the exceptions in Article I, Section 22(B) would say that. They do not.

**{¶41}** **History and Purpose.** Fourth, the plain meaning of Article I, Section 22(B), considered in its constitutional context, is sufficient to resolve the State's assignment of error in the negative. But to the extent we need to check our work, the history and purpose of the Reproductive Freedom Amendment are consistent with the conclusion we reach about its scope. We consider this backdrop solely as a secondary source of support for our conclusion, as the words of the Constitution remain paramount to our analysis. *See Yerkey*, 2022-Ohio-4298, at ¶ 35 (DeWine, J., dissenting), citing *Knab*, 2020-Ohio-5219, at ¶ 22.

**{¶42}** Ohio voters adopted the Amendment the year after the Supreme Court removed the federal constitutional protection for abortion and returned the issue of abortion regulation to the states. *See Dobbs*, 597 U.S. at 300, 302. Its title—"The Right to Reproductive Freedom with Protections for Health and Safety"—describes its core purpose—to protect reproductive decisions and activities from State interference absent a real health and safety concern.

**{¶43}** This context suggests that the voters of Ohio intended to create a separate, independent state constitutional basis for protecting abortion and abortion providers from State intervention, other than that explicitly allowed by the Amendment.[4] In this regard, the Reproductive Freedom Amendment fills the constitutional void left by *Dobbs*. Nothing in this history or the rationale for the Amendment suggests that the voters intended to excise post-abortion conduct from its protections. Rather, the fact that Ohio voters mobilized quickly to counteract a decision of the United States Supreme Court sends a strong message of their desire to

---

[4] The Amendment permits the State to regulate abortion if it demonstrates that "it is using the least restrictive means to advance the individual's health in accordance with widely accepted and evidence-based standards of care." Ohio Const., art. I, § 22(B). The State may also prohibit abortion after the point of fetal viability, with exceptions for the life and health of the pregnant person. *Id*.

protect reproductive rights.

**{¶44}** Ohio voters said what they meant. The State may not burden, penalize, or discriminate against those who have an abortion and those who assist them in obtaining one. This does not mean that all State regulation of abortion runs afoul of the Reproductive Freedom Amendment, as the Amendment itself specifies conditions under which the State may intervene. But the State's proposed interpretation—which excludes regulations of post-abortion conduct from those conditions—is incorrect. We accordingly construe Article I, Section 22(B) of the Ohio Constitution to apply to legislation that regulates conduct occurring before, during, and after a procedural abortion. The mere fact that S.B. 27 regulates conduct occurring after an abortion does not remove it from the scope of the Reproductive Freedom Amendment. We overrule the State's first assignment of error on this basis.

### B. Severability

**{¶45}** The State's second assignment of error argues that the trial court erred in failing to sever the dispositional requirement from the remainder of S.B. 27. From the State's perspective, once the trial court declared R.C. 3726.02(A) invalid, it should have simply enjoined that provision and left the remainder of S.B. 27 intact.

**{¶46}** The question of severability is a legal one that we review de novo. *See, e.g., Home Builders Assn. of Dayton v. City of Lebanon*, 2006-Ohio-595, ¶ 34 (12th Dist.) (evaluating severance under de novo standard of review).

**{¶47}** A court that declares a portion of an Ohio law to be unconstitutional must determine, pursuant to R.C. 1.50, whether any other provisions or related sections of the law can be given effect without the invalid provision. *See, e.g., State ex rel. Whitehead v. Sandusky Cty. Bd. of Commrs.*, 2012-Ohio-4837, ¶ 28. In carrying out this directive, courts ask three questions to determine when severance is

appropriate:

(1)     Are the constitutional and unconstitutional parts capable of separation so that each may be read and may stand by itself?

(2)     Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out?

(3)     Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*State ex rel. Sunset Estate Properties, LLC v. Village of Lodi*, 2015-Ohio-790, ¶ 17, citing *Geiger v. Geiger*, 117 Ohio St. 451, 466 (1927). The statute can only be severed when the answer to the first question is yes, and the answers to the second and third questions are no. *State v. Noling*, 2016-Ohio-8252, ¶ 35.

**{¶48}** With regard to severance, S.B. 27 enacted two types of regulations that might be severed from the dispositional requirement—those that cross-reference the dispositional requirement in some manner[5] and those that amend preexisting statutes or definitions without regard to the disposal of fetal tissue.[6] The State contends that both groups are capable of independent enforcement and that the trial court went too

---

[5] As previously described, these include the portions of S.B. 27 that enact R.C. 3726.01 (definitions), R.C. 3726.03 (right to select method of disposition), R.C. 3726.04 (manner of selecting method of disposition), R.C. 3726.05 (release prohibited prior to dispositional method selection), R.C. 3726.09 (dispositional funding requirement), R.C. 3726.10 (disposition documentation), R.C. 3726.11 (disposition documentation), R.C. 3726.12 (disposition policies), R.C. 3726.13 (disposition lists), R.C. 3726.14 (health director rules governing disposition), R.C. 3726.15 (noncompliance), R.C. 3726.95 (noncompliance), R.C. 3726.16 (conflicting provisions), R.C. 3726.99 (criminal liability), R.C. 4717.271 (crematory facilities), and R.C. 2317.56(B)(4) (abortion regulation).
[6] There are only three provisions of this type in S.B. 27: (1) R.C. 2317.56(A)(3) (amending "probable gestational age" definition), (2) R.C. 3701.79(C) (requiring an abortion report), and (3) R.C. 3701.79(I) (requiring health department data).

far in enjoining them. We disagree, at least as to the portions of S.B. 27 that directly give meaning to the dispositional requirement.

**{¶49}** We begin with the first severance question: are the constitutional and unconstitutional parts capable of separation so that each may be read and may stand by itself? This standard requires us to consider whether the remaining portions of the law are capable of independent meaning after the unconstitutional provision is excised—in other words, can we remove part of the statute "by running a blue pencil through it." *Emler v. Ferne*, 23 Ohio App. 218, 221 (1st Dist. 1926). In answering this question, courts consider whether any of the remaining provisions are reliant upon the unconstitutional provision for their meaning. *See, e.g., City of Cleveland v. State*, 2014-Ohio-86, ¶ 20.

**{¶50}** With regard to the group of provisions in S.B. 27 that incorporate and reference the dispositional requirement, these portions of the bill are not capable of standing independently. To the contrary, these provisions define the process by which the dispositional requirement will be carried out, regulated, and enforced. They impose myriad regulations on patients and providers with regard to the disposition of fetal tissue, including how a patient's choice between the two mandated dispositional methods is recorded, how crematory facilities are to handle fetal tissue, what records abortion providers must maintain to comply with the dispositional requirement, and who may be punished with a crime for violating S.B. 27's dispositional mandates.

**{¶51}** Without the dispositional requirement, these provisions become nonsensical, as they all relate to and carry out S.B. 27's central requirement that fetal tissue be disposed of by only interment or cremation. What meaning, for example, does a form recording a pregnant person's dispositional selection have when the law no longer requires that choice? To what effect is it to create a crime for violating the

dispositional requirement when there is actually no such thing?

**{¶52}** For the provisions of S.B. 27 that incorporate the dispositional requirement, we accordingly answer the first severance question: "No." These sections of the bill are not capable of being read separately from the unconstitutional portion of the law. And for that reason, these provisions cannot be severed. *See Noling*, 2016-Ohio-8252, at ¶ 35 (noting that a "no" answer to the first severance question will preclude severance).

**{¶53}** But the landscape is different with regard to the three provisions in S.B. 27 that merely amend preexisting legal definitions or requirements without reference to the mandate that fetal tissue be cremated or interred. In three places, S.B. 27 adds the words "zygote" and "blastocyte" to regulations that were already on the books. *See* S.B. 27 (amending R.C. 2317.56(A)(3), 3701.79(C), and 3701.79(I)). These changes occur in portions of the bill that do not discuss, define, or otherwise relate to the dispositional requirement. And in that regard, the answer to the first severance question for these provisions is "Yes." We can insert these words into current statutes and read them independently.

**{¶54}** Doing so does not make it impossible to give effect or meaning to the Legislature's intent, as best we understand it. The intent of S.B. 27, as a whole, is clearly to require interment or cremation of fetal tissue that results from abortion. In fact, the bill says as much. *See* S.B. 27 (indicating that the bill amends and enacts provisions of the Revised Code "to impose requirements on the final disposition of fetal remains from surgical abortions"). But, because the amendments to R.C. 2317.56(A)(3), 3701.79(C), and 3701.79(I) do not reference the dispositional requirement and instead pertain to unrelated abortion regulations, we can discern that the Legislature may have had a different idea in mind with respect to these changes.

25

R.C. 2317.56(A)(3) relates to the definition of "probable gestational age." R.C. 3701.79(C) relates to the individual abortion report that is required each time a provider performs an abortion. R.C. 3701.79(I) relates to the collection of data by the health department. The inclusion of the words "zygote" and "blastocyte" in these regulations expand the type of biological organisms subject to these statutory subsections—a wholly separate objective from mandating the method of tissue disposition. Severing these provisions from the dispositional requirement gives effect to the Legislature's distinct intent in adopting them.[7]

{¶55} Finally, we need not add any words to give these linguistic amendments effect. At least on the record before us, these amendments appear to be mere terminology updates. Because each amended statute already contained a list of biological organisms and S.B. 27 merely adds the words "zygote" and "blastocyte" to the list, we do not need to reword the bill as a result of severance. These provisions stand neatly on their own.

{¶56} With regard to S.B. 27's amendments to R.C. 2317.56(A)(3), 3701.79(C), and 3701.79(I), we accordingly answer the severance questions "Yes," "No," and "No." These provisions should therefore be severed from S.B. 27. *See Noling*, 2016-Ohio-8252, at ¶ 35.

{¶57} We accordingly sustain the State's second assignment of error in part and overrule it in part. We modify the trial court's judgment to sever the amendments to R.C. 2317.56(A)(3), 3701.79(C), and 3701.79(I) from the injunction against the enforcement of S.B. 27.

---

[7] While there may be scientific, medical, or personal significance to the inclusion of the words "zygote" and "blastocyte" in statutes about abortion, no party has briefed that significance to us, nor did the providers separately argue the inclusion of these terms as a basis for relief below.

26

### *Conclusion*

{¶58} In this appeal, we have answered the questions the State posited for us to review, and no more. Consistent with the rules of party presentation and the role of the court, our opinion resolves the two assignments of error the State presented, while leaving for another day questions the parties did not preserve for our review. *See* App.R. 12(A)(1)(b).

{¶59} In addressing the State's two narrow assignments of error, we disagree with the State that the Reproductive Freedom Amendment solely applies to conduct occurring before and during an abortion. The plain language of the Amendment applies to government action that affects all phases of reproductive decision-making, including discrimination that might occur after a procedure. But we agree with the State, in part, that the trial court went a step too far in enjoining the entirety of S.B. 27 because large swaths of it discriminate against abortion providers. We accordingly modify the trial court's judgment to excise the portions of S.B. 27 that amended R.C. 2317.56(A)(3) and 3701.79(C) and (I) from its permanent injunction and allow the State to enforce those portions of the bill.

{¶60} We accordingly overrule the State's first assignment of error. As to its second assignment of error, we overrule it in part and sustain it in part. The trial court's judgment is affirmed as modified as explained in this opinion.

Judgment affirmed as modified.

ZAYAS and CROUSE, JJ., concur.